UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JAMES O'BRIEN

             Plaintiff,

    v.                            **DECISION AND ORDER**

                                   **07-CV-1153 (VEB)**

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

             Defendant.

## I. Introduction

      Plaintiff James O'Brien challenges an Administrative Law Judge's ("ALJ")

determination that he is not entitled to disability insurance benefits ("DIB") under

the Social Security Act ("the Act").  Plaintiff alleges he has been disabled since

May 28, 2002, because of pain and limitations from hepatitis C and cirrhosis of

the liver, pulmonary emboli and deep vein thrombosis, restless leg syndrome,

migraine headaches, seizure disorder, and fatigue.  Plaintiff met the disability

insured status requirements of the Act through December 31, 2006.

## II.  Background

      Plaintiff filed an application for DIB on April 4, 2002, alleging an onset of

disability date of September 21, 2001.  The claim was denied initially on July 17,

2002, and Plaintiff filed a timely request for a hearing on September 1, 2002.

Plaintiff appeared at the hearing without a representative, and on July 28, 2004,

the ALJ found that Plaintiff was not under a disability during the relevant time

frame.  Plaintiff requested a review of the ALJ's decision by the Appeals Council

1

on August 16, 2004.  On July 27, 2006, the Appeals Council vacated the ALJ's decision and remanded the matter for further development of the record and for a new hearing.  Plaintiff, now represented by counsel, wrote to the Social Security Administration on August 16, 2004, and again on December 6, 2004, stating that he had developed a new impairment and wished to reapply for DIB with an alleged onset date of April 2, 2004.  However, Plaintiff's record does not contain a later application for benefits.  ALJ Michael Brounoff admitted Plaintiff's letters into the record as a subsequent application for benefits, and consolidated this subsequent application with Plaintiff's original application for DIB dated April 4, 2002, that was on remand from the Appeals Council.  An administrative hearing was held on May 4, 2006, at which time Plaintiff, his attorney, his wife, and a friend appeared before ALJ Brounoff.  A vocational expert testified via videoconference.  The ALJ considered the case *de novo*, and on December 27, 2006, issued a decision finding that Plaintiff was not disabled during the time frame relevant to his claim.  On August 31, 2007, the Appeals Council denied Plaintiff's request for review.

On October 29, 2007, Plaintiff filed a Civil Complaint challenging Defendant's final decision and requesting the Court to review the decision of the ALJ pursuant to Section 205(g) and 1631(c) (3) of the Act, modify the decision of Defendant, and grant DIB benefits to Plaintiff.[1]  The Defendant filed an answer to Plaintiff's complaint on December 27, 2007, requesting the Court to dismiss Plaintiff's complaint.  Plaintiff submitted a Plaintiff's Brief on February 29, 2008.

---

[1] The ALJ's December 27, 2006 decision became the Commissioner's final decision in this case when the Appeals Council denied Plaintiff's request for review.

On March 13, 2008, Defendant filed a Brief in Support of the Commissioner's Motion for Judgment on the Pleadings ("Defendant's Brief")[2] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  After full briefing, the Court deemed oral argument unnecessary and took the motions under advisement.

The parties, by and through their respective counsel, consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636 (c) and Rule 73 of the Federal Rules of Civil Procedure.  The Honorable Norman A. Mordue, Chief United States District Judge, referred this case to the undersigned for disposition.

For the reasons set forth below, this Court finds no reversible error and finds that substantial evidence supports the ALJ's decision.  Thus, the Court affirms the decision of the Commissioner.

### III.  Discussion

#### A.  Legal Standard and Scope of Review:

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled.  See 42 U.S.C. § 405(g), 1383 (c)(3); Wagner v. Sec'y of Health and Human Servs., 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's determination will only be reversed if it is not supported by substantial evidence or there has been a legal error. See  Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).  "Substantial evidence" is evidence that amounts to "more than a mere scintilla,"

---

[2] Although no motion for judgment on the pleadings was filed, the moving party was excused from such filing under General Order No. 18, which states in part: "The Magistrate Judge will treat the proceeding as if both parties had accompanied their briefs with a motion for judgment on the pleadings…"

and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).  Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.  See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams on Behalf of Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).  If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." Valente v. Sec'y of Health and Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

The Commissioner has established a five-step sequential evaluation process[3] to determine whether an individual is disabled as defined under the

---

[3]        This five-step process is detailed below:

First, the [Commissioner] considers whether the claimant is currently engaged substantial gainful

Social Security Act.  See 20 C.F.R. § 404.1520, 416.920.  The United States

Supreme Court recognized the validity of this analysis in Bowen v. Yuckert, 482

U.S. 137, 140-142, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987), and it

remains the proper approach for analyzing whether a claimant is disabled.

    While the claimant has the burden of proof as to the first four steps, the

Commissioner has the burden of proof on the fifth and final step.  See Bowen,

482 U.S. at 146 n.5; Ferraris v. Heckler, 728 F.2d 582 (2d Cir. 1984).  The final

step of this inquiry is, in turn, divided into two parts.  First, the Commissioner

must assess the claimant's job qualifications by considering his physical ability,

age, education, and work experience.  Second, the Commissioner must

determine whether jobs exist in the national economy that a person having the

claimant's qualifications could perform.  See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R.

§ 404.1520(f); Heckler v. Campbell, 461 U.S. 458, 460, 103 S. Ct. 1952, 1954,

76 L. Ed. 2d 66 (1983).

## B. Analysis

### 1.    Commissioner's Decision

---

activity.  If he is not, the [Commissioner]next considers whether the claimant has a "severe impairment" which
significantly limits his physical or mental ability to do basic work active-ties.  If the claimant has such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment
which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work
experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment,
the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); see also Rosa v. Callahan, 168 F.3d 72,77 (2d Cir. 1999); 20 C.F.R. § 404.1520.

In this case, the ALJ made the following findings with regard to factual information as well as the five-step process set forth above: (1) Plaintiff met the insured status requirements of the Social Security Act through December 31, 2006 (R. at 22);[4]  (2) Plaintiff has not engaged in substantial gainful activity since May 28, 2002, the amended alleged onset date (20 C.F.R. §§ 404.1520(b), 404.1571 *et.seq.,* 416.920(b) and 416.971 *et. seq.*) (R. at 22); (3) Plaintiff has the following severe impairments: hepatitis C and cirrhosis of the liver with side effects of Interferon/Ribavirin therapy (Plaintiff is on a liver transplant list); Pulmonary Emboli; Deep Vein Thromboses; Restless Leg Syndrome, and Migraine Headaches (both identified in 2004); and a Seizure Disorder (20 C.F.R. §§ 404.1520(c) and 416.920(c)) (R. at 22); (4) Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926) (R. at 25); (5) Plaintiff has the residual functional capacity to engage in a full range of work requiring medium exertion.  He occasionally can lift and/or carry up to 50 pounds, stand, walk and sit without limitation in an 8-hour workday, use his hands and arms without restriction, perform all postural acts continuously, and climb occasionally, but must avoid heights, temperature extremes, and hazardous conditions including working around machinery.  He has no significant mental limitations (R. at 25); (6) Plaintiff is capable of performing his past relevant work as a cabinet maker (1993-2001), a job requiring medium exertion (heavy as actually performed), and Supervisor, janitorial services (1987-1991), a

---

[4] Citations to the underlying administrative are designated as "R."

job requiring medium exertion (heavy as actually performed).  This work does not require the performance of work-related activities precluded by Plaintiff's residual functional capacity (20 C.F.R. §§ 404.1565 and 416.965) (R. at 28); and (7) Plaintiff has not been under a disability, as defined in the Social Security Act, from May 28, 2002, through the date of the ALJ's decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)) (R. at 29).  Ultimately, the ALJ determined Plaintiff was not entitled to a period of disability and disability insurance benefits as set forth in sections 216(i) and 223(d) of the Social Security Act (R. at 29).

### 2.    Plaintiff's Claims

Plaintiff challenges the decision of the ALJ on the basis that it is not supported by the substantial evidence of record.  Specifically, Plaintiff alleges (a) the ALJ erred by finding Plaintiff's claims of fatigue caused no limitations in his ability to perform substantial gainful activity, (b) the ALJ did not properly assess Plaintiff's credibility, (c) the ALJ erred when he found Plaintiff retained the residual functional capacity to perform the exertional requirements of medium work, and (d) the ALJ erred by failing to find Plaintiff's depression is a severe impairment.  See Plaintiff's Brief, pp. 1, 4-12.

### a.    The ALJ Properly Considered Plaintiff's Claims of Fatigue When Assessing His Ability To Perform Substantial Gainful Activity

Plaintiff's first challenge to the ALJ's decision is that the ALJ failed to find that Plaintiff's fatigue would limit his ability to perform any substantial gainful activity.  See Plaintiff's Brief, pp. 4-6.  Specifically, Plaintiff alleges that his primary complaint is, and has always been, extreme fatigue caused by hepatitis

C, cirrhosis of the liver, and side of effects medications, including the Dilantin[5] he takes to control his seizures.  See Plaintiff's Brief, p.4.  The Defendant argues that while Plaintiff has periodically complained to his physicians of fatigue while undergoing treatment for hepatitis C, his symptoms were transient and resolved when he completed treatment.  See Defendant's Brief, pp. 20-21.  Further, Defendant contends Plaintiff's fatigue did not last the requisite 12 months to be considered disabling under the Act.  See Defendant's Brief, p. 21.

A claimant will not be found to be disabled, and entitled to benefits under the Act, unless he or she has demonstrated through medical and other evidence "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months…".  See 42 U.S.C. § 423(d)(1)(A).  In this matter, there is nothing contained in Plaintiff's medical evidence that suggests his complaints of extreme fatigue resulting from his impairments and medications did not resolve in less than 12 months when treatment was either stopped or completed.  As an example, Plaintiff discussed the procedure for a liver biopsy with his treating physician, Dr. Islam Fahmy, on April 9, 2001 (R. at 141).  Plaintiff reported he felt "okay most of the time" but "sometimes he gets a bit fatigued." Id.  On June 14, 2001, Plaintiff followed up with a nurse practitioner, Jonathan

---

[5] Dilantin, or phenytoin, is used to control certain type of seizures, and to treat and prevent seizures that may begin during or after surgery to the brain or nervous system. Phenytoin is an anticonvulsants and works by decreasing abnormal electrical activity in the brain.  Common side effects include difficulty falling or staying asleep, abnormal body movements, loss of coordination, headache, confusion, nausea or vomiting.  See http:www.nlm.nih.gov/medlineplus/druginfo/meds/a682022.htm.

Briggs, after beginning PEG-Interferon[6] treatment (R. at 113).  He reported that

he experienced fever, chills, and nausea with his first treatment, but the side

effects had subsided.  Id.  Plaintiff was examined by treating physician, Dr. Aamir

Rasheed, on June 24, 2001, and Dr. Rasheed reported Plaintiff was doing well

and denied any side effects from medication, including Dilantin (R. at 124).   On

October 15, 2001, Plaintiff was examined by his treating physician, Dr. Steven

Hassig, and told the doctor that he had tolerated his treatment with PEG-

Interferon well and had not experienced the significant side effects he suffered

initially (R. at 146).  Plaintiff was examined by Dr. Hassig again on January 17,

2002, one and one-half months after completing PEG-Interferon therapy, and

reported he was doing well and had not missed work because of the treatment

(R. at 147).  On March 4, 2002, Plaintiff underwent a complete physical

examination by treating physician, Dr. Fahmy (R. at 118).  He told the doctor that

he felt well overall, and had no complaints.  Id.  Plaintiff was examined by Dr.

Hassig on May 21, 2002, and again reported that he felt well (R. at 196).  On

June 25, 2002, Plaintiff underwent a consultative examination by State agency

physician, Dr. Pranab Datta (R. at 176-180).  Plaintiff told Dr. Datta that his

primary complaint was that he became tired and easily fatigued, and took naps

from time to time (R. at 176).  The examination was otherwise unremarkable and

Dr. Datta opined Plaintiff's only physical limitation was that he should avoid

working at heights or around open machinery because of his seizure history (R.

---

[6] Peginterferon alfa-2a is used alone or in combination with ribavirin (a medication) to treat chronic (long-term) hepatitis C infection (swelling of the liver caused by a virus) in people who show signs of liver damage and who have not been treated with interferon alpha (medication similar to peg-interferon alfa-2a) in the past.  Common side effects include upset stomach, vomiting, loss of appetite, diarrhea, difficulty falling asleep or staying asleep.  See http:www.nlm.nih.gov/medlineplus/druginfo/meds/a605029.htm.

at 179).  Plaintiff followed up with Dr. Hassig on July 2, 2002, and on August 13,

2002, and reported no significant difficulties (R. at 197, 198).  However, on

October 31, 2002, he told Dr. Hassig that he was easily fatigued (R. at 199).

Plaintiff began a new course of PEG-Interferon therapy in combination with

Rebetol[7] in mid-December 2002 (R. at 200).  He reported to Dr. Hassig that the

treatment caused vague nausea at times, along with some dizziness.  Id.  Dr.

Hassig recommended Plaintiff take extra strength Tylenol to combat the side

effects of the medications.  Id.  Two days later, on January 23, 2003, Plaintiff was

examined by Dr. Rasheed (R. at 189).  He claimed some tiredness but denied

any side effects from medication.  Id.  On March 27, 2003, Dr. Hassig reported

Plaintiff was advised to discontinue PEG-Interferon and Rebetol therapy because

he had developed right leg venous thrombosis (R. at 202).  Plaintiff told the

doctor he was happier and more comfortable off the medications.  Id.  Dr. Hassig

recommended Plaintiff discontinue risky behaviors including drinking alcohol,

smoking, and riding his motorcycle.  Id.  On September 22, 2003, Dr. Hassig

advised Plaintiff to begin a new course of PEG-Interferon and Rebetol therapy

(R. at 203).  Plaintiff declined to start the therapy again until spring because he

wanted to avoid the potential side effect of depression during the winter months.

Id.  Plaintiff was examined by Dr. Fahmy on March 31, 2004 (R. at 307-308).  He

told the doctor he was scheduled to begin PEG-Interferon treatment again and

requested an anti-depressant while undergoing the treatment (R. at 307).  On

---

[7] Rebetol, or ribavarin, is used with an interferon to treat hepatitis C. Ribavirin is in a class of
antiviral medications called nucleoside analogues and works by stopping the virus that causes
hepatitis C from spreading inside the body.  See
http:www.nlm.nih.gov/medlineplus/druginfo/meds/a605018.htm.

July 16, 2004, Dr. Fahmy examined Plaintiff after he started PEG-Interferon treatment (R. at 310).  Plaintiff claimed worsening depression and the doctor increased his dosage of Lexapro[8].  Id.  Plaintiff discontinued PEG-Interferon and Rebetol treatment on August 30, 2004, after he was hospitalized for pneumonia and a pulmonary embolism (R. at 361-379).  When Plaintiff was discharged from the hospital on September 8, 2004, Dr. Aliaksandr Kats reported he was "drastically improved and he was discharged feeling well" (R. at 361).  Plaintiff followed up with Nurse practitioner Briggs on February 25, 2005, on August 25, 2005, and on January 26, 2006 (R. at 319, 320, 321).  He reported he was feeling well, with no side effects from his medications.  Id.  Nurse practitioner Briggs noted Plaintiff took Lexapro for "mild depression, which has been stable" (R. at 321).  On March 9, 2006, a physician, Dr. Thomas McDonald, and a certified nurse practitioner, Bruce Askey, wrote a letter "To Whom It May Concern" stating that "it is possible that [Plaintiff's] liver disease contributing [sic] to his fatigue and it is entirely possible that this would cause him to be disabled from a work perspective" (R. at 318).  One week later, on March 17, 2006, Plaintiff underwent another consultative examination by State agency physician, Dr. Mark Henderson (R. at 326-331).  The results of the examination were unremarkable except that the doctor noted Plaintiff had a mildly enlarged liver (R. at 330).  Plaintiff complained of severe fatigue and a low energy level (R. at 326).  Three days later, on March 20, 2006, Plaintiff was evaluated by Dr. Ashokkumar

---

[8] Lexapro (Escitalopram) is used to treat depression and generalized anxiety disorder. Escitalopram is in a class of antidepressants called selective serotonin reuptake inhibitors (SSRIs) and works by increasing the amount of serotonin in the brain.  See http:www.nlm.nih.gov/medlineplus/druginfo/meds/a603005.htm.

Jain to determine if he was suitable candidate for a liver transplant (R. at 339-340).  He told Dr. Jain "his main symptom is just slight fatigue" (R. at 339).  On April 11, 2006, nurse practitioner Askey wrote another letter "To Whom It May Concern" stating Plaintiff is not a candidate for employment because of severe fatigue resulting from hepatitis C and cirrhosis of the liver (R. at 359).  Nurse practitioner Askey wrote a third letter "To Whom It May Concern" on April 27, 2006, stating Plaintiff's impairments and medications *may* cause extreme fatigue (R. at 358).

In his decision, the ALJ considered Plaintiff's claims of extreme fatigue caused by his severe impairments and medications but noted that Plaintiff did not report side-effects from the Dilantin he took for seizure control, and the side effects from his treatment with PEG-Interferon and Rebetol resolved when treatment was stopped (R. at 27).  Thus, Plaintiff's side effects, including nausea and severe fatigue, did not last the requisite 12 months required by the Act.  Id. Further, the ALJ did not doubt that Plaintiff experienced some fatigue related to his impairments, but considering Plaintiff's medical records, and his own statements to his treating physicians concerning his symptoms, it is unlikely Plaintiff's fatigue would render him totally disabled within the meaning of the Act. Id.  It is the sole responsibility of the ALJ to weigh all medical evidence and resolve any material conflicts in the record.  See Richardson v. Perales, 402 U.S. 389, 399, 91 S. Ct. 1420, 1426, 28 L. Ed. 2d 842 (1971).  Thus, the Court finds that the ALJ carefully reviewed and acknowledged Plaintiff's claims of extreme fatigue, as well as the medical evidence and opinions contained in

Plaintiff's record, gave proper weight to Plaintiff's statements and the opinions of the treating and examining physicians, and correctly determined Plaintiff's fatigue did not preclude him from performing substantial gainful activity.

> **b.    The ALJ Properly Assessed Plaintiff's Credibility**

Plaintiff's second challenge to the ALJ's decision is that the ALJ failed to properly assess Plaintiff's credibility.  Specifically, Plaintiff alleges the ALJ did not consider the seven factors required by 20 C.F.R. § 404.1529(c)(3) and SSR 96-7p when assessing a claimant's statements, and did not credit Plaintiff with an excellent work history.  See Rivera v. Schweiker, 717 F.2d 719, 725 (2d Cir. 1983) "The second circuit has established that a claimant with a good work record is entitled to substantial credibility when claiming inability to work because of a disability."  See also Dombrowski v. Chater, 960 F. Supp. 558, 565 (N.D.N.Y. 1997).   See Plaintiff's Brief, pp. 7-10.  The defendant argues that the ALJ reasonably found that Plaintiff's subjective complaints were not fully credible, based on Plaintiff's medical evidence and the opinions of two of Plaintiff's treating physicians that he retained the residual functional capacity to perform a broad range of medium work[9].  See Defendant's Brief, pp. 20-21.

An individual's statements about his or her condition, and the limitations caused by it, are not enough to establish disability.  See 20 C.F.R. § 404.1529. The Commissioner's regulations require that an ALJ consider a claimant's observable signs and laboratory findings, as well as reported symptoms, when determining whether or not a disability exists within the meaning of the

---

[9] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, he or she can also do sedentary and light work.  See 20 C.F.R. § 404.1567(c).

regulations.  Id.  When an ALJ determines a claimant has an underlying physical

and/or mental impairment(s) that could reasonably be expected to produce the

reported pain or other symptoms, the ALJ must then evaluate the intensity,

persistence, and limiting effects of the symptoms on the claimant's ability to do

work-related activities.  See 20 C.F.R. § 404.1529(c); SSR 96-7p.

      Plaintiff's medical evidence clearly establishes he has a severe

combination of impairments including a seizure disorder, restless leg syndrome,

migraine headaches, hepatitis C, cirrhosis of the liver, and limitations from

treatment with PEG-Interferon and Rebetol, including pulmonary emboli and

deep vein thromboses (R. at 22, 102-379).  He testified that the primary symptom

caused by his impairments that prevents him from working is fatigue and a lack

of energy (R. at 423, 425, 426, 429, 437, 438, 439, 446, 448, 449, 451, 452).

Without re-stating all of the medical evidence discussed in Section (a) above, it

was apparent to the ALJ that Plaintiff's impairments could be expected to

produce the symptoms of sleepiness, fatigue, headaches, and lack of energy, but

without the intensity and limiting effects Plaintiff alleged.  Thus, as required by 20

C.F.R § 404.1529 and SSR 96-7p, the ALJ considered (1) Plaintiff's daily

activities, (2) the location, frequency and intensity of his pain and/or other

symptoms, (3) the factors that precipitate and aggravate his symptoms, (4) the

type, dosage,  effectiveness, and side-effects of Plaintiff's medications, (5) other

treatments Plaintiff's receives to alleviate his symptoms, (6) measures other tan

treatment Plaintiff undertakes to alleviate his symptoms, and (7) other factors

concerning Plaintiff's functional limitations and restrictions because of pain or other symptoms (R. at 26-28).

The ALJ noted Plaintiff is independent in his activities of daily living, and spends time taking care of his four year-old grandson (R. at 26, 434).  Plaintiff helps out around the house with laundry and grocery store errands, and drives a car (R. at 26, 435).  He sleeps six to seven hours each night, sleeps for about two hours mid-morning, and sleeps again for several hours in the afternoon (R. at 26-27, 437-438).  The ALJ noted Plaintiff's seizure disorder is fully controlled as long as he is compliant with his medication regime, and because he is no longer treated with PEG-Interferon and Rebetol, he does not suffer debilitating side-effects from these medications (R. at 27).  Further, the ALJ observed that two of Plaintiff's treating physicians, Doctors Rasheed and Hassig, provided detailed functional medical source opinions of Plaintiff's residual functional capacity and these opinions were consistent with medium level work (R. at 27, 192-194, 218-221, 224-227).  The ALJ also noted the medical findings of the State agency physicians who examined Plaintiff did not differ significantly from the findings of Plaintiff's treating physicians (R. at 28, 176-180, 326-331).

Thus, the Court finds the ALJ properly considered Plaintiff's symptoms, complaints of severe fatigue, and reported limitations, along with the medical and other evidence in the record, and further finds the totality of evidence does not substantiate Plaintiff's claims that his severe fatigue and other symptoms are disabling within the meaning of the Act.  With respect to Plaintiff's complaint that the ALJ did not give credit to his work history, the Court notes Plaintiff has

15

significant employment gaps in employment, including a gap of approximately 18 months in 1986-1987, and a gap of one year in 1992 (R. at 67).  Moreover, Plaintiff's treating physicians opined in February 2004, and again in June 2004, that Plaintiff retained the residual functional capacity to perform work at the medium level (R. at 192-194, 218-221, 224-227).  Accordingly, the ALJ exercised his discretion to evaluate the credibility of Plaintiff's testimony, presented a summary of his evaluation, and rendered an independent judgment regarding the extent of Plaintiff's subjective complaints based on the objective medical and other evidence (R. at 22-29).  See e.g. Mimms v. Sec'y of Health and Human Servs., 750 F.2d 180, 196 (2d Cir. 1984).  The ALJ found Plaintiff's claims of severe fatigue and limitations from his severe impairments to be not entirely credible and determined Plaintiff could return to his past relevant medium work as a cabinet maker or as a janitorial maintenance supervisor (R. at 28-29).

### c.    The ALJ Properly Evaluated Plaintiff's Residual Functional Capacity

Plaintiff's third challenge to the ALJ's decision is that he failed to properly evaluate Plaintiff's residual functional capacity.  See Plaintiff's Brief, pp. 10-11. Specifically, Plaintiff alleges that while the ALJ found Plaintiff able to lift 50 pounds occasionally, he did not evaluate Plaintiff's ability to lift 25 pounds frequently.  Id.  Plaintiff further claims the ALJ disregarded the opinion of Plaintiff's treating physician, Dr. Lon Ovedovitz, that Plaintiff is unable to perform even the requirements of work at the sedentary level[10], and the opinion of nurse

---

[10] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  See 20 C.F.R. § 404.1567(a).

practitioner Askey that Plaintiff is unemployable because of his fatigue and impairments . Id.  The Defendant argues that the ALJ considered the evidence of record, and per the Commissioner's regulations, properly gave great weight to the well-supported opinions of Plaintiff's treating physicians.  See Defendant's Brief, pp. 21-24.  Defendant further argues that the highly restrictive assessment of Dr. Ovedovitz is unsupported by the evidence of record, including any records provided by the doctor, and the opinion of nurse practitioner Askey is entitled to no special weight because he is not an acceptable treating source.  See Defendant's Brief, p. 23.

The Commissioner's regulations provide that an ALJ will give more weight to opinions from treating sources since these medical professionals are able to give a detailed longitudinal perspective about the nature and severity of an individual's impairments.  See 20 C.F.R. § 404.1527(d)(2).  If a treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in [the] case record," the ALJ may give the opinion(s) controlling weight.  Id.  On the contrary, if a treating source's opinion is not given controlling weight, the ALJ will consider the length of the treatment relationship and the frequency of examination, the nature of the treatment relationship, the supportability of the treating source's opinion, the consistency with other evidence in the record, the area of specialization of the treating source, and other factors that support or contradict the opinion.  See 20 C.F.R. § 404.1527(d)(2)(i)(ii)(3)(4)(5)(6).  The Commissioner's regulations do not include certified nurse practitioners as an

acceptable medical source, although the evidence and opinions from such medical providers may be considered by an ALJ to document the nature and severity of a claimant's impairments.  See 20 C.F.R  § 404.1513(d)(1).

In this matter, the ALJ properly gave controlling weight to the opinions of Drs. Rasheed and Hassig that, as of June 2004, Plaintiff could perform the requirements of a broad range of medium work (R. at 28, 192-194, 218-221, 224-227).  The opinions of Drs. Rasheed and Hassig are supported by the unremarkable findings of State agency physicians, Drs. Datta and Henderson, after thorough medical examinations of Plaintiff (R. at 28, 176-180, 326-331).  While Plaintiff claims the ALJ had no basis for determining Plaintiff could frequently lift and carry items weighing up to 25 pounds, Dr. Rasheed assessed Plaintiff as having the residual functional capacity to frequently lift and carry items weighing up to 25 pounds (R. at 224).  See Plaintiff's Brief, p. 10.  This assessment was supported by Dr. Datta, who opined Plaintiff had no limitations with his upper extremities for fine and gross motor activities, and by Dr. Henderson, who opined Plaintiff had only a mild restriction for "prolonged heavy lifting and heavy carrying" (R. at 179, 330).

While Dr. Ovedovitz answered a questionnaire on November 5, 2004, indicating Plaintiff was unable to perform even the requirements of sedentary work, it is unclear from the record the nature of the relationship between Plaintiff and Dr. Ovedovitz (R. at 299-303).  Dr. Ovedovitz failed to provide treatment records for Plaintiff when requested by the ALJ (R. at 28, 287, 289).  Thus, the ALJ properly gave little weight to Dr. Ovedovitz's opinion (R. at 28).

18

With respect to the joint opinion of Dr. McDonald and nurse practitioner Askey that Plaintiff's liver disease might possibly cause fatigue, and might possibly cause him to be disabled, and later letters from nurse practitioner Askey reiterating these opinions, the ALJ properly gave little weight to these statements (R. at 28).  The ALJ noted the term "possible" is vague and "does not establish a medical opinion based on a reasonable medical probability."  Id.  Further, determination of a claimant's disability, and his or her residual functional capacity, is a matter reserved to the Commissioner.  See 20 C.F.R. § 404.1527(e)(2); 20 C.F.R. § 404.1546; SSR 96-5p.

From his decision in this matter, it is clear to the Court that the ALJ examined all of the medical evidence available to him and properly concluded that Plaintiff retained the residual functional capacity to perform his medium level past relevant work as a cabinet maker or as a janitorial supervisor (R. at 28-29).  Because Plaintiff could return to his past relevant work, he was not under a disability during the time frame relevant to this claim.

### d. The ALJ Properly Assessed Plaintiff's Depression As Non-severe

Plaintiff's fourth challenge to the ALJ's decision is that the ALJ erred by failing to find that Plaintiff's depression is a severe impairment.  See Plaintiff's Brief, pp. 11-12.  Plaintiff claims that even if the ALJ did not find that his depression was disabling in and of itself, the ALJ was required to consider Plaintiff's depression to determine if it creates an additional impairment to working.  See Plaintiff's Brief, p.11.  The Defendant argues the record fails to

19

support Plaintiff's assertion that his depression is a severe mental impairment. See Defendant's Brief, p. 24.

The Court notes Plaintiff did not claim depression as an impairment that prevents him from working when he filed his Adult Disability Report on April 3, 2002 (R. at 68-77).  Further, during Plaintiff's hearing with the ALJ, he was questioned at length in the presence of his attorney about all of the conditions he was alleging as the basis for disability (R. at 423-425).  Plaintiff did not assert depression as an impairment.  Id.

Nevertheless, Plaintiff has been treated periodically for depression.  On January 21, 2003, Plaintiff told Dr. Hassig that he believed "there is an element of depression" in his mental state (R. at 200).  He did not request medication or psychotherapy, and the doctor did not prescribe any treatment.  Id.  Two days later, on January 23, 2003, Plaintiff was examined by his neurologist, Dr. Rasheed (R. at 189).  Plaintiff did not report that he was depressed.  Id. However, on February 2, 2003, Plaintiff was referred to Oakdale Psychology Associates for treatment of depression by Dr. Aamir Pasha, an associate of Dr. Rasheed (R. at 290).  Plaintiff reported to his psychologist, Dr. Arthur Frenz, that he had a lot of anger and was depressed about his health, finances, and family issues (R. at 292-295).  Dr. Frenz recommended nine sessions of individual psychotherapy, but the record is unclear as to whether or not Plaintiff attended the sessions, and if the treatment was effective (R. at 293).  When Plaintiff was examined by Dr. Rasheed on August 27, 2003, he did not claim to be depressed and Dr. Rasheed noted Plaintiff's only medication at that time was Dilantin (R. at

20

190).  Plaintiff was examined by Dr. Hassig on September 23, 2003, and the
doctor recommended that Plaintiff begin a new course of PEG-Interferon therapy
(R. at 203).  Plaintiff decided to wait until the spring to re-start the medication
because of "his potential for depression during the winter months."  Id.  On March
31, 2004, Plaintiff asked his treating physician, Dr. Fahmy, for an anti-depressant
prescription as he was scheduled to re-start PEG-Interferon treatment (R. at 307-
308).  Dr. Fahmy prescribed 10 milligrams of Lexapro daily (R. at 307).  Dr.
Fahmy increased Plaintiff's Lexapro dosage to 20 milligrams on July 16, 2004,
when Plaintiff claimed increased depression after he began his new course of
PEG-Interferon treatment (R. at 310).  Plaintiff was examined by nurse
practitioner Briggs on February 25, 2005, when he developed a sinus infection
(R. at 319).  Plaintiff reported he had been feeling well, and did not claim to be
depressed.  Id.  Mr. Briggs did not report that Plaintiff was taking anti-
depressants at the time of the examination.  Id.  Plaintiff was examined by Mr.
Briggs again on August 26, 2005 (R. at 320).  Plaintiff told the nurse practitioner
he was feeling well and did not mention depression as an ailment, nor was he
taking anti-depressant medication.  Id.  On January 26, 2006, nurse practitioner
Briggs examined Plaintiff and noted "he continues on his Lexapro for mild
depression, which has been stable" (R. at 321).  It is unclear from the record
which physician, if any, prescribed Lexapro on a continuing basis, as Plaintiff had
not been treated by the original prescribing source, Dr. Fahmy, since September
2004 (R. at 314).  Plaintiff underwent an internal medicine examination by State
agency physician, Dr. Henderson, on March 17, 2006 (R. at 326-331).  He did

not tell the doctor that he had been treated for depression in the past and did not mention he was currently depressed (R. at 326-327).  Plaintiff told Dr. Henderson the only medication he was taking was the anti-seizure medication, Dilantin (R. at 327).  Three days later, on March 20, 2006, Plaintiff underwent a full assessment for a liver transplant by Dr. Jain (R. at 339-357).  Once again, he did not mention that he had a history of treatment for depression, nor did he tell Dr. Jain that he was depressed.  Id.  He reported his only medication as Dilantin (R. at 339).

From the record, it appears that Plaintiff's depression was a transient condition affected by his treatment with PEG-Interferon and by periodic stressors, including job loss and family problems (R. at 291-292, 295-296, 307-308, 310, 321).  Other than for a brief time in early 2003, Plaintiff did not seek psychotherapy, nor does it appear that Plaintiff's treating sources recommended psychotherapy.  Plaintiff's mild depression was managed by medication, but it is unclear from the record which medical provider was responsible for the management of this condition after September 2004.  Moreover, at his hearing before ALJ Tamant in June 2004, and again at his hearing before ALJ Brounoff in May 2006, Plaintiff did not claim depression as a condition that prevented him from working.  Thus, the Court finds the ALJ did not err when he omitted the mental impairment of depression from consideration as one of Plaintiff's severe impairments.

**IV. Conclusion**

22

After carefully examining the administrative record, the Court finds substantial evidence supports the ALJ's decision in this case, including the objective medical and psychological evidence and supported medical and psychologist opinions.  It is clear to the Court that the ALJ thoroughly examined the record, afforded appropriate weight to all the medical and psychological evidence, including Plaintiff's treating sources and the State agency physicians, and afforded Plaintiff's subjective claims of physical and mental limitations an appropriate weight when rendering his decision that Plaintiff is not disabled.  The Court finds no reversible error and, further finding that substantial evidence supports the ALJ's decision, the Court will grant Defendant's Motion for Judgment on the Pleadings and deny Plaintiff's motion seeking the same.

IT IS HEREBY ORDERED, that Defendant's Motion for Judgment on the Pleadings is GRANTED.

FURTHER, that Plaintiff's Motion for Judgment on the Pleadings is DENIED.

FURTHER, that the Clerk of the Court is directed to take the necessary steps to close this case.

SO ORDERED.

Dated:      March 31, 2011
            Binghamton, New York

Victor E. Bianchini
United States Magistrate Judge

23